IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID NICHOLAS and ANNA ELY, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  23 C 16467 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| THE INDEPENDENT ORDER OF FORESTERS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| THE INDEPENDENT ORDER OF FORESTERS, | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID NICHOLAS and ANNA ELY, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs/Counterclaim-Defendants David Nicholas and Anna Ely (collectively,

"plaintiffs") sued an insurance company, defendant/counterclaim-plaintiff The Independent

Order of Foresters ("defendant"), in Illinois state court for breach of contract, seeking to recover

$150,000 in death benefits under a life insurance policy that defendant issued to Rosie Costello.

Defendant thereafter removed the case to this court based on federal diversity jurisdiction.   It

then filed counterclaims (eventually amending them), alleging that neither David Nicholas nor

Anna Ely was related to Rosie Costello, that a third-party imposter had impersonated Rosie

Costello and originated the policy, and that the policy was originated and procured through

fraud.   The amended counterclaims are pleaded in four counts: an Illinois state law claim

seeking a declaratory judgment that the policy is illegal and void ab initio (Count I); an Illinois

state law claim for insurance fraud under 720 ILCS 5/17-10.5(e) (Count II); an Illinois state law claim for common law fraud (Count III); and an Illinois state law claim for civil conspiracy (Count IV). Defendant seeks, among other things, $300,000 (double the policy amount) under 720 ILCS 5/17-10.5(e)(1) and attorney fees and costs.

Defendant now moves for summary judgment on plaintiffs' complaint and on its counterclaims. For the reasons below, the court grants in part and denies in part defendant's motion.

## BACKGROUND

This case centers on a $150,000 life insurance policy that defendant issued in 2018 on the life of Rosie Costello—who died in 2022—with David Nicholas and Anna Ely listed as the two beneficiaries. David Nicholas is purportedly Rosie Costello's biological son (though he was unable to produce a birth certificate to prove this). He testified at his deposition that his biological parents were Rosie Costello and Tommy Nicholas (thus explaining the "Nicholas" last name). Anna Ely is not biologically related to either Rosie Costello or David Nicholas, and although she admits to having initially claimed in this case to have been Rosie Costello's "equitably adopted daughter," she later admitted that she was neither legally nor equitably adopted by Rosie Costello. She testified at her deposition, though, that Rosie Costello treated her like a daughter and was a mother figure to her. She did not attend Rosie Costello's funeral, she did not post anything about Rosie Costello on her social media accounts, and she was unable to produce a single photo of her with Rosie Costello even though she has over 5,000 photos on her phone and social media accounts.

2

The story here begins on March 28, 2018, when independent insurance producer Gary Isaac spoke with an individual over the phone who was interested in procuring a $150,000 life insurance policy on her life.   According to an affidavit from Isaac, he had reached out to this individual by calling a phone number that the individual had provided to a third-party insurance agency, and when he made contact with her, the individual identified herself as "Rosie Castillo," spelling her name "Castillo."   Isaac had never met or previously spoken to anyone by the name of Rosie "Castillo" or Rosie "Costello."   According to his affidavit, Isaac "spoke with this individual via telephone on a few occasions."   He further says that he "walked this individual through the life insurance application over the phone."

Isaac then recorded the information provided by the individual.   He asserts that she provided him with "the necessary information, which included a copy of her ID card."   But, he states, "the initial copy of her ID card was not legible" and so, "[i]n a follow up conversation, she provided a more legible copy of her ID card, which was accepted by underwriting."   Isaac further says that "[i]t would have been [his] practice to confirm the accuracy of all the information in the application with the prospective insured" and "to confirm the spelling of any names and addresses in the application with the insured," and that he has "no reason to believe that [he] did not follow [his] standard practice here."

Isaac also states that "he completed the application on [the woman's] behalf" with the information she provided to him, and that the "individual purporting to be Rosie Castillo provided the names of two beneficiaries: David N. Castillo and Anna Ely."   He then sent the completed application to her and instructed her to carefully review it and confirm its accuracy before signing.   Isaac states that he sent the application to the email address

3

rcastillo1952@aol.com, and that that the application was signed that very same day (March 28, 2018).

The application identified Rosie "Castillo" as the insured and policy owner.   It also lists her date of birth as April 21, 1954; her address as 680 Flora Ave, Akron, Ohio; her state of birth as Ohio; her occupation as "Secretary" with an income of $35,000 in the last year; and her weight as 138 pounds.   Rosie Costello's date of birth is April 21, 1952; Rosie Costello has never lived in Ohio; her birth certificate states that she was born in New York; she was a homemaker with no income and was fully financially supported by her family; and her ID card states that she weighed 190 pounds.

The application also listed as a beneficiary "David N Castillo."   David Nicholas stated at his deposition that he never used the last name "Castillo" or "Costello" (again, he says his father's last name was "Nicholas").   The application further listed as a beneficiary Anna Ely and states that she is the "Child" of the insured.   Again, though, Anna Ely is not the child of Rosie Costello.   The application also indicated that the insured had no existing life insurance policy. Rosie Costello, however, had a $400,000 Farmers Insurance Policy, with premiums that were paid by David Nicholas and (his brother) Sonny Nicholas.   The application further identified the insured as the person who would pay the premiums, and it indicates that the first premium payment would come from Chase Bank checking account number xxxxx1286.   It appears that the application was "e-signed" by both Isaac and Rosie "Castillo," and that it was Isaac who handwrote both signatures.

On April 5, 2018, defendant issued the policy, explicitly providing that its contestability period would not apply to "fraud."   A week later, the name "Rosie Castillo" was listed on a

handwritten "Request [to defendant] for Pre-Authorized Checking Plan," which sought to change the bank account from which premium payments were to be made to a Chase Bank Account No. xxxxx1986. That account was purportedly owned by Rosie "Castillo." But that account did not belong to Rosie Costello; it belonged to Anna Ely, who confirmed that all premiums on the policy were paid out of this account.

What is more, the address listed on the document is in Akron, Ohio. But Rosie Costello never lived in Ohio at any point. She also never went to school, she could not read or write, and she never spelled her name "Castillo" or otherwise went by the name "Castillo." Nicholas testified at his deposition that Rosie Costello also did not have a car and that he did not remember her taking any trips or vacations between 2018 and 2022. He also testified, though, that Rosie Costello had a sister "Cookie" who lived in Ohio and a daughter "Debbie" who lives in Cleveland, Ohio.

A couple of weeks later, the name "Rosie Castillo" was provided on a handwritten "Beneficiary Change Form," requesting a change in the beneficiary's name from David "Castillo" to David "Nicholas." The document listed the address as being in Akron, Ohio, and indicated that the document was executed there. The form was faxed and sent to defendant from a hotel in Akron, Ohio.

In May 2018, defendant was sent an envelope that enclosed a handwritten "Name Change Form" that identified the name "Rosie Costello" and that requested changing the owner's name from Rosie "Castillo" to Rosie "Costello." The reason given for the change was that the "Name [was] incorrectly shown on company records." A separate handwritten note was also enclosed which stated, "to whom it may concern, please correct the spelling of my last name, the correct

spelling is Costello."   The change form indicated that it was executed in Akron, Ohio.   The envelope was postmarked as being sent from Cincinnati, Ohio.

In June 2018, defendant was sent an envelope containing a second handwritten Beneficiary Change Form, which listed the owner as "Rosie Costello" and which indicated that it was seeking to change one of the beneficiary names to David "Nicholas."   The form indicated that both Rosie Costello and David Nicholas lived at 680 Flora Ave, Akron, Ohio, and that it was executed in Akron, Ohio.   The envelope was postmarked as being sent from Cleveland, Ohio. A handwritten note was also included, which was witnessed by Rachel Nicholas, who was listed as being a "Friend" of Rosie Costello.   Rachel Nicholas was in fact one of Rosie Costello's daughters.   The form was signed by a notary, who represented that Rachel Nicholas appeared before her, but who did not represent or notarize the presence of Rosie Costello.

In July 2018, defendant received an envelope with the name "Rosie Costello" listed on the return address, and which included a handwritten letter and a copy of Rosie Costello's ID. The letter stated: "To who it may concern: This is my 4 [sic] time trying to correct and make changes to my Policy.   You should have all papers on file and notary letter on file to change beneficiary and correct my spelling of last name.   Here is a better copy of my ID."   The listed return address indicated that the envelope was sent from Akron, Ohio, but it was postmarked as being sent from Cleveland, Ohio.

On May 19, 2022, Rosie Costello died.   Anna Ely did not attend any funeral or service for Rosie Costello, and David Nicholas could not provide any invoices from such services. Nearly six months after Rosie Costello's death, plaintiffs submitted a claim form for the policy's death benefit.   The claim form listed David Nicholas's and Anna Ely's respective addresses as

both being "2200 E Devon Ave., Des Plaines, IL"—an address that belonged to George Prassas

of GP Financial, who was the "witness" on the form.   The form also states that Rosie Costello

lived at 6922 W Talcott Ave, Chicago, IL—which Nicholas testified was Anna Ely's address and

one that Rosie Costello never lived at—and that Anna Ely was Rosie Costello's "Daughter."

Both David Nicholas and Anna Ely testified that they did not fill out the information on the

form; Anna Ely testified that George Prassas did so.

## **DISCUSSION**

Defendant has moved for summary judgment on all claims.   Summary judgment is

proper when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A fact is "material"

if it affects the outcome of the case under the governing law and a dispute is "genuine" if the

evidence is such that a reasonable factfinder could return a verdict for the nonmovant.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient

evidence to support a factual dispute that warrants submission to a factfinder for resolution at

trial.   See id. at 249.   The court must view all facts in the light most favorable to the nonmovant

and draw all reasonable inferences in its favor.   See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986).   In the end, the court must analyze the motion in light of both

the applicable substantive law and the question of whether a reasonable factfinder could return a

verdict for the nonmovant.   Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th

Cir. 1988).   If the record as a whole could not lead a reasonable factfinder to find for the

nonmovant, there is no genuine issue for trial and summary judgment is appropriate.   See Matsushita Elec., 475 U.S. at 587.

Defendant here argues that the "uncontroverted facts establish that" plaintiffs, "with the assistance of a third-party imposter, committed insurance fraud to induce [defendant] to issue the Policy, make changes to the Policy's owner and beneficiaries, and pay out the false claim submitted by [them] to [defendant], following Ms. Costello's death."   Defendant thus concludes that summary judgment is appropriate on all counts.   The court now turns to the counts.

## Count I

In Count I, defendant asserts an Illinois state law claim seeking a declaratory judgment that the policy is illegal and void ab initio—that is, "from the beginning" or its inception.   In its opening brief, defendant contends that this is so for two reasons: (1) the policy was originated by an imposter; and (2) the policy lacks an "insurable interest" because it was funded by non-relative Anna Ely.

Beginning with the imposter claim, under Illinois law, a policy that is procured by an imposter—someone impersonating the insured—is void ab initio.   See Valant v. Metro. Life Ins. Co., 302 Ill. App. 196, 201-05 (1st Dist. 1939) (incontestability clause does not apply where "the person making the application . . . impersonates another").[1]   That is because there could not have been any "meeting of the minds—a fundamental requisite of all contracts."   Obartuch v. Security Mut. Life Ins. Co., 114 F.2d 873, 878 (7th Cir. 1940) (because the district "court found

---

[1]   Because both parties here assume that Illinois law governs this entire dispute, the court applies Illinois law.   See LincolnWay Cmty. Bank v. Allianz Life Ins. Co. of N. Am., No. 11-CV-5907, 2013 WL 5212750, at *3 n.2 (N.D. Ill. Sept. 17, 2013) ("[c]ourts do not worry about conflict of laws unless the parties disagree on which state's law applies." (citation omitted)).

that Frank Obartuch was without knowledge as to the alleged contract of insurance and, that he had no intention of insuring his life and was not the person submitted for medical examination," "the policies as issued were void and the incontestable clause without effect"). Simply stated: "Insurance companies do not insure names. They insure lives." Id. at 877 (citation omitted).

Determining whether a policy was procured by an imposter is a question of fact. See Valant, 302 Ill. App. at 204 ("the question of whether there had been an impersonation of Kazimer Valant by another was, in the first instance, a question for the jury"). If the factfinder finds that the contract was procured by an imposter and thus void ab initio, the contract "must be treated as though it never existed; no provision can be enforced." LincolnWay Cmty. Bank v. Allianz Life Ins. Co. of N. Am., No. 11-CV-5907, 2013 WL 5212750, at *3 (N.D. Ill. Sept. 17, 2013).

Defendant argues here that the undisputed facts establish that the policy at issue was "not procured or originated by Ms. Costello." Instead, defendant contends, the policy was "procured and originated by an individual who was impersonating Ms. Costello from the outset, and continued to impersonate Ms. Costello for months from Ohio." The evidence, defendant says, is "uncontroverted that Ms. Costello could not read or write, did not own a car, did not live in Ohio, and did not travel outside the statute [sic] of Illinois after 2018." Defendant thus concludes that as a matter of law it "is entitled to a declaratory judgment that the Policy is illegal and void *ab initio*."

In response, plaintiffs do not dispute that a policy that was procured by an imposter will result in that policy being void ab initio. They argue, though, that defendant's "claim that the Policy was originated by a third-party imposter is simply not a fact." Defendant, they say,

9

cannot show that a "third-party imposter originated the application," or that "Rosie Costello did not travel to Ohio, originate the Policy, and have someone help her draft change forms for her." Rather, they contend, defendant's "entire claim is based on its conjecture" and on David Nicholas's testimony that he did not think that his mother traveled outside of Illinois. They argue that, given that Rosie Costello could not read and write—and that "all reasonable inferences should be drawn in favor of the nonmoving party"—the court cannot conclude as a matter of law that the policy was originated by someone other than Rosie Costello.

In reply, defendant contends that the facts establish that "it was not the real Rosie Costello applying for the Policy," and that plaintiffs' theory that "Isaac simply took down the wrong information" is unsupported and unavailing. According to defendant: "This isn't one, minor, typographic mistake," and plaintiffs have "offer[ed] no explanation as to how Isaac could have misheard or mistakenly transcribed nearly *all* of the information on the application." (Emphasis in original). Defendant thus concludes that plaintiffs' "'mistake' theory is belied by common sense and unsupported by the factual record."

The court finds that defendant has not established that, as a matter of law, the policy was originated by an imposter. To be sure, there is substantial evidence that would support a reasonable factfinder finding that an imposter originated the policy. Indeed, the errors on the application and other documents are suspicious. But the evidence is not so strong that the court can conclude that no reasonable factfinder could find otherwise.

For example, Isaac states in his affidavit that he was the one that took down information over the phone from the individual who he says identified herself as Rosie "Castillo." Isaac was also the person who signed the document on that individual's behalf. And although Isaac says

10

that he received a more legible version of an ID card, that card does not appear to be in the record.   If that card said "Castillo," it certainly would indicate that an imposter originated the policy.   But defendant has not provided a copy of the ID card that Isaac states was accepted by the underwriters.   The only ID card in the record instead clearly says "Rosie Costello" and states that her address was 2942 N. Elston Ave in Chicago, Illinois.   The parties agree, moreover, that Rosie Costello never went to school and could not read or write, which could support a reasonable inference that she may not have been able to properly review the application that Isaac filled out.   Plaintiffs are correct, too, that Isaac does not claim to have confirmed the accuracy of the information with this individual.   He claims instead that it merely would have been his practice to do so.

What's more, shortly after the policy issued, the alleged imposter sought to change the name on the policy to "Costello," marking on the change form that the reason for doing so was that the "Name [was] incorrectly shown on company records."   Defendant fails to explain why this and other correspondence it received shortly after issuing the policy establish the existence of an imposter when the same apparently did not contemporaneously raise any red flags for defendant—who seemed content to collect premium payments on the policy.   Defendant places significant weight on David Nicholas's testimony that Rosie Costello never lived in Ohio (where the documents were purportedly executed) at any point, that she did not have a car, and that he did not remember her having taken any trips or vacations during the relevant time.   But defendant ignores that he also testified that Rosie Costello had a sister (Cookie) who lived in Ohio and a daughter (Debbie) who lived in Cleveland, Ohio—the city from which the June 2018

11

Beneficiary Change Form was postmarked—and that Rosie Costello "probably went to visit" Cookie during the time of the correspondence with defendant.

In short, a factfinder would have to weigh the evidence and determine what inferences to draw from it. Defendant is thus not entitled to summary judgment that the policy is void ab initio because an imposter originated the policy.

Turning next to the "insurable interest" claim, under Illinois law, a life insurance policy that was procured by a person without an "insurable interest" in the life of the insured is void ab initio. See Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., 44 F.4th 1024, 1028 (7th Cir. 2022); see also 215 ILCS 159/50(a) and 159/5 (prohibiting life insurance policies that are "purchased with resources or guarantees from or through a person or entity who, at the time of policy inception, could not lawfully initiate the policy himself or itself"). "[A]n insurable interest is an interest in having the life [of the insured] continue." LincolnWay, 2013 WL 5212750, at *5 (citation omitted). This typically means that "the owner or buyer of a life insurance policy, at least at its inception," has "some sort of family and/or financial interest in the continued life of the insured." Sun Life, 44 F.4th at 1028. So, for example, an "insurable interest" exists "when a person takes out an insurance policy on his own life" or "on the life of a close family member, or when the policyholder is a creditor of the insured." Id. at 1031-32 (cleaned up).

The reason that "Illinois law prohibits the initial sale of a life insurance policy to someone who has no insurable interest in the life of the insured" is rooted in public policy: without the purchaser having an insurable interest, the policy is a "pure wager" that "gives the policyholder a sinister counter interest in having the life of the insured come to an end." Id.

12

(cleaned up); see also Penn Mut. Life Ins. Co. v. Greatbanc Tr. Co., 887 F. Supp. 2d 822, 824 (N.D. Ill. 2012) ("The principle underlying the law's aversion to [stranger-owned life insurance] is the longstanding public policy against wagering contracts."); Dresen v. Metropolitan Life Ins., 195 Ill. App. 292, 293 (Ill. App. Ct. 1915) ("plaintiff had no insurable interest in the life of the insured, which fact makes the policy void as a 'wager contract' and therefore against public policy"). And so, "stranger-owned life insurance" contracts—or "STOLI" contracts—"are considered illegal and void from their inception." LincolnWay, 2013 WL 5212750, at *3. Determining whether the purchaser lacked an insurable interest is a question of fact. See id. at *5 ("Whether Scott Veselik had an 'insurable interest' in the life of his father is a question of fact"). Making that factual determination requires "look[ing] beyond the form of the transaction and consider[ing] the substance" of the purchase. Sun Life, 44 F.4th at 1034.

Defendant asserts here that Rosie Costello "never made one premium payment." Instead, defendant argues, the policy was "was funded by Anna Ely from its inception"— someone who was "not related by blood, or by law, to Ms. Costello." So, defendant concludes, it is "entitled to a declaratory judgment that the Policy is illegal and void ab initio."

In response, plaintiffs do not dispute that a life insurance policy that was procured by a person without an "insurable interest" in the life of the insured is void ab initio. In fact, as defendant points out in its reply brief, plaintiffs "utterly fail to respond to th[e] argument" that the policy lacked an insurable interest. Thus, defendant argues, any such argument is waived. The court agrees, and this waiver alone would entitle defendant to summary judgment here. See Yang v. Fedex Freight, Inc., No. 15 CV 1037, 2016 WL 3444219, at *6 (N.D. Ill. June 23, 2016) ("Because a failure to respond to an argument constitutes waiver, summary judgment is granted

in defendants' favor on those claims."); see also Nichols v. Michigan City Plant Plan. Dep't, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.")

But even if it would not, defendant asserts, it is undisputed that Anna Ely—not Rosie Costello or David Nicholas—paid all the premiums and is not related to Rosie Costello. Therefore, it concludes, no reasonable jury could find that Anna Ely had any insurable interest in Rosie Costello's life. The court agrees that defendant is entitled to summary judgment that the policy is void ab initio because Anna Ely procured the policy and lacked an insurable interest. There are no genuine disputes over any facts that are material on this issue, and thus defendant is entitled to judgment as a matter of law on it.

Indeed, it is undisputed here that all premiums on the policy were paid out of Anna Ely's bank account. See Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., No. 17 C 06588, 2020 WL 1503641, at *10 (N.D. Ill. Mar. 30, 2020), aff'd in part, 44 F.4th 1024 (7th Cir. 2022) (looking to "who paid the premiums" in determining who was "the true owner of the Policy at inception"). Although an insured who "borrow[s] money" to procure a policy "with an obligation to repay" may "qualify as an insured procuring a policy," Lincolnway Cmty. Bank v. Allianz Life Ins. Co. of N. Am., No. 11 C 5907, 2015 WL 7251931, at *3 (N.D. Ill. Nov. 17, 2015) (citation omitted), there is no evidence here that Rosie Costello was borrowing money from Anna Ely to pay the premiums with an obligation to repay. Anna Ely was therefore the person who effectively procured the policy. Cf. Dresen, 195 Ill. App. at 293-94 ("The fact that plaintiff paid substantially all the premiums from the time the policy was issued, and had the

policy in his actual possession from about the date of its issue, may be said to demonstrate that he indirectly procured the policy to issue upon the life of the insured for his benefit.").

It is also undisputed that Rosie Costello had no income and was fully financially supported by her family. She thus neither needed nor could afford the policy herself. See Sun Life, 44 F.4th at 1035 (undisputed fact that "Corwell did not need and could not afford the policy himself" supported that the policy "was an unlawful wager" on his life).

It is further undisputed that Anna Ely was not legally related to Rosie Costello. See Dresen, 195 Ill. App. at 293 ("Plaintiff admitted on the trial that he was not a cousin of the insured or any other blood relation of hers."). Nor was Anna Ely "a creditor of the insured," and she bore no "other relationship to [Rosie Costello] which, under the law, would give [her] an insurable interest in [Rosie Costello's] life." Id. And again, Rosie Costello had no income and was supported by her family. Consequently, Anna Ely would have had no "financial interest in the continued life of the insured." Sun Life, 44 F.4th at 1028.

The court thus finds that no reasonable factfinder could find that the policy was procured by someone having an insurable interest in the life of Rosie Costello. The policy was accordingly void ab initio. As a result, defendant is entitled to summary judgment on its counterclaim Count I and on plaintiffs' underlying breach of contract claim.

## Count II

In Count II, defendant asserts an Illinois state law claim for insurance fraud under 720 ILCS 5/17-10.5(e). That subsection provides in relevant part:

> A person who knowingly . . . attempts to obtain, or causes to be obtained, by deception, control over the property of any insurance company by the making of a false claim or by causing a false claim to be made on a policy of insurance issued by an insurance company . . . intending to deprive an insurance company . . .

15

permanently of the use and benefit of that property, shall be civilly liable to the insurance company . . . in an amount equal to . . . , if no property was wrongfully obtained, twice the value of the property attempted to be obtained . . . plus reasonable attorney's fees.

720 ILCS 5/17-10.5(e)(1).   The statute further defines "false claim" as:

any statement made to any insurer . . . made as part of, or in support of, a claim for payment . . . under a policy of insurance, or as part of, or in support of, an application for the issuance of . . . any insurance policy, when the statement does any of the following:
> (1) Contains any false, incomplete, or misleading information concerning any fact or thing material to the claim.
> (2) Conceals (i) the occurrence of an event that is material to any person's initial or continued right or entitlement to any insurance benefit or payment or (ii) the amount of any benefit or payment to which the person is entitled.

720 ILCS 5/17-0.5.

Defendant argues that the "uncontroverted facts prove that [plaintiffs] acted in concert with one or more third party individuals to impersonate Ms. Costello throughout the application process to induce [defendant] to issue the Policy, make changes to the Policy's owner and beneficiary, and pay out the claim after Ms. Costello's passing."   According to defendant, "[n]early all of the information in the Policy's Application was false."   And, defendant contends, after the policy issued, plaintiffs "sent or caused to be sent correspondences to [defendant] through third-party imposters in Ohio," and those imposters were "acting for the benefit, and at the behest of," plaintiffs.   Defendant further argues that the claim form contained "false representations about [plaintiffs'] own contact information and Rosie Costello's contact information."   Therefore, it says, plaintiffs "unequivocally committed insurance fraud" under 720 ILCS § 5/17-10.5.

16

In response, plaintiffs argue that defendant has not "present[ed] a single fact" that plaintiffs "acted in concert with a third-party imposter to fraudulently originate an insurance policy in Rosie Costello's name." They ask, rhetorically, "why would [plaintiffs] travel all the way to Ohio to originate the Policy when" they "resided in Illinois the entire relevant time period?" They further argue that the fact that they "were the named beneficiaries and that the premium payments were made out of Anna Ely's account" are "by themselves . . . not indicative of insurance fraud." And they assert that "there are simply no facts that link" them to "the Policy or its origination."

In reply, defendant asserts that "throughout the entirety of the Policy," Anna Ely "falsely claimed to be the 'child' or the 'daughter' of Ms. Costello" and this was done to induce defendant to "pay the death claim to Ely who had no insurable interest in Costello's life." Defendant further asserts that plaintiffs also fail to "explain how Costello could have obtained Ely's account information" to execute the Payment Modification form. So, defendant argues, "the only reasonable conclusion that a jury could reach is that either Ely herself was impersonating Costello from Ohio or that [plaintiffs] 'caused this false claim to be made' with Ely's assistance in contravention of Illinois law." Finally, defendant contends, the death claim form was "littered with misrepresentations about who" plaintiffs were, where they and Rosie Costello lived, and what Anna Ely's relationship to Rosie Costello was.

The court finds that, although this is a close question, defendant is not entitled to summary judgment on its insurance fraud claim. The statute at issue here requires defendant to prove that plaintiffs "knowingly . . . attempt[ed] to obtain, or cause[d] to be obtained, by deception, control over the property of any insurance company by the making of a false claim or

17

by causing a false claim to be made on a policy of insurance issued by an insurance company . . .

<u>intending</u> to deprive an insurance company" of property.   720 ILCS 5/17-10.5(e)(1).   "The

drawing of inferences, particularly in respect to questions of knowledge and intent are generally

peculiarly within the province of the fact finder who observed the witnesses."   <u>HCP of Illinois,</u>

<u>Inc. v. Farbman Grp. I, Inc.</u>, 978 F. Supp. 2d 943, 956 (N.D. Ill. 2013).   And so "[c]ourts in this

district have recognized that intent often cannot be resolved at the summary judgment stage."

<u>Segura v. TLC Learning Ctr.</u>, No. 12 C 7020, 2015 WL 93910, at *6 (N.D. Ill. Jan. 6, 2015); <u>see</u>

<u>also HCP</u>, 978 F. Supp. 2d at 956-57 ("motive and intent are rarely susceptible to resolution at

the summary judgment stage").

      That is the case here.   As for defendant's assertion that plaintiffs worked with a third

party to originate a policy that contained false information and thereafter "sent or caused to be

sent correspondences to [defendant] through third-party imposters in Ohio," defendant presents

no direct evidence that plaintiffs worked with anyone or sent (or caused to be sent) anything.

Defendant's case is instead based entirely on circumstantial evidence and inferences to be drawn

therefrom.   That, of course, may sway a factfinder at trial.   But the circumstantial evidence here

is not enough to warrant summary judgment: while a reasonable jury could find based on the

evidence that there was an imposter or that plaintiffs caused correspondence to be sent related to

the policy, defendant fails to establish that no reasonable jury could find otherwise.

      For example, defendant claims that plaintiffs' failure to explain how Rosie Costello

obtained Anna Ely's bank account information is suspicious.   But, for its part, defendant fails to

explain why, if plaintiffs were involved, they provided incorrect or false information—like Rosie

Costello's name and even David Nicholas's own name—to begin with.   Presumably, if David

Nicholas were impersonating—or helping someone to impersonate—his mother, he would have provided accurate information in order to maintain the ruse and avoid detection. Nor does defendant explain why plaintiffs would coordinate all this from Ohio—where neither of them live—and submit to defendant Rosie Costello's ID, which plainly states that she lives in Illinois. Whatever the case may be, it is for the factfinder to draw the appropriate inferences from the evidence.

The same goes for the claim form's use of GP Financial's George Prassas's address for David Nicholas's and Anna Ely's addresses, for its use of Anna Ely's address for Rosie Costello's address, and for its having listed Anna Ely as Rosie Costello's "daughter." Both David Nicholas and Anna Ely testified that they did not fill out the information on the form. Anna Ely testified that George Prassas did instead. She also testified that Rosie Costello treated her like a daughter and was a mother figure to her. All of this may strain credulity. But again, it is for the factfinder to assess credibility, to draw inferences from the evidence, and to determine knowledge and intent.

In sum, although the evidence suggests suspicious activity, drawing all inferences in favor of plaintiffs, it does not entitle defendant to judgment as a matter of law. The court therefore denies defendant's motion for summary judgment on Count II.

## Count III

In Count III, defendant asserts an Illinois state law claim for common law fraud. To establish common-law fraud, defendant must prove that plaintiffs made a false statement of material fact, knowing that it was false or with reckless disregard for its truth or falsity, to induce defendant's reliance, and that defendant relied on the statement and was injured as a result. City

19

of Chi. v. Purdue Pharma L.P., No. 14 C 4361, 2015 WL 2208423, at *14 (N.D. Ill. May 8,

2015) (citing Small v. Sussman, 713 N.E.2d 1216, 1221 (Ill. App. Ct.1999)); see also Allstate

Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C., 691 F. Supp. 2d 772, 794 (N.D. Ill. 2010).

Defendant also "must show it justifiably relied on another's statements."   Allstate, 691 F. Supp.

2d at 794 (quoting D.S.A Fin. Corp. v. Cnty of Cook, 345 Ill. App. 3d 554, 560 (2003)).   "A

party is not justified in relying on representations made when he has ample opportunity to

ascertain the truth of the representations before he acts."   Id. (cleaned up).   "Whether a party's

reliance is justified is a question of fact viewed in light of the surrounding circumstances, taking

into account both what the plaintiff knew and what he could have learned through the exercise of

ordinary prudence."   Id. (cleaned up).

Defendant asserts here that plaintiffs acted in concert with a third-party imposter to

induce defendant to issue the policy and pay out the claim, that defendant "reasonably and

justifiably relied on" the misrepresentations in the application and later correspondence, and that

defendant was damaged by those misrepresentations.   Plaintiffs argue in response that there are

no facts showing that plaintiffs made "any false statements of material fact," that plaintiffs

"knew that such statements were false" or were made "to induce [defendant] to act," or that

defendant "actually relied on the truth of [any] such statements."   In reply, defendant argues that

it "unequivocally relied" on the misstatements and that its reliance "was justified because

[defendant] mistakenly believed [it] w[as] corresponding with the real Rosie Costello, the owner

of the Policy."   And it argues that it is "justified in relying upon the representations of another,

without independent investigation, where the person to whom the representations are made does

20

not have the same ability to discover the truth as the person making the representations." (Quoting Gerill Corp. v. Jack L. Hargrove Builders, Inc., 128 Ill. 2d 179, 195 (1989)).

For the same reasons discussed above on the insurance fraud claim, the court also finds that defendant is not entitled to summary judgment on its common law fraud claim. Again, the factfinder will need to assess credibility, to draw inferences from the evidence, and to determine plaintiffs' knowledge and intent. And as for justifiable reliance, defendant has not shown that the information here is like the information that was at issue in Gerill. Specifically, defendant has not shown that the information here—addresses, names, familial relationships, bank accounts, and so on—was "almost exclusively within the knowledge of [plaintiffs] and it would have been difficult, if not impossible, for [defendant] to discover." Gerill, 128 Ill. 2d at 195 ("[T]he existence of the Cook County lawsuit and information regarding the joint venture's construction costs, unlike taxes, mortgages and loans, were matters almost exclusively within the knowledge of Hargrove and it would have been difficult, if not impossible, for Rosch to discover them."). The court thus denies defendant's motion for summary judgment on Count III.

## Count IV

In Count IV, defendant asserts an Illinois state law claim for civil conspiracy. "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." see also Purdue Pharma, 2015 WL 2208423, at *15 (quoting Adcock v. Brakegate, Ltd., 164 Ill. 2d 54, 894 (1994)). "[A] conspiracy is not an independent tort." Indeck N. Am. Power Fund, L.P. v. Norweb PLC, 316 Ill. App. 3d 416, 432 (1st. Dist. 2000). Thus, if a party "fails to state

an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." Id.

Here, defendant argues that plaintiffs "acted in concert through a formal or informal agreement with at least one third party imposter who was physically present in Ohio to defraud [defendant], for the direct benefit of [plaintiff]." But because the court has denied summary judgment on defendant's two fraud claims, it also denies summary judgment on the conspiracy claim.

## CONCLUSION

For the reasons above, the court grants in part and denies in part defendant The Independent Order of Foresters' motion for summary judgment [56]. The court denies summary judgment on counterclaim Count I to the extent that it is based on the existence of an imposter, but grants summary judgment on Count I based on the lack of an insurable interest. As a result, the court declares that the life insurance policy at issue was void ab initio. Because the policy was void ab initio, the court also grants summary judgment in favor of defendant on plaintiffs' breach of contract claim. The court further denies summary judgment on counterclaim Counts II-IV. The parties are directed to submit a short joint status report by May 22, 2025, proposing next steps in this case.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

DATE:    May 1, 2025

22